**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

GMS MINE REPAIR &
MAINTENANCE, INC.,

                        Plaintiff,

v.                                    CIVIL ACTION NO.  2:21-cv-00184

BRADLEY BAIZE, et al.,

                        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Bradley Baize's ("Baize" or "Defendant") Motion to Dismiss Plaintiff's Complaint.  (ECF No. 7.)  For the reasons explained in greater detail below, the Court **GRANTS** Defendant's Motion.

*I.     BACKGROUND*

*A.  Factual Background*

This action, brought by Plaintiff GMS Mine Repair & Maintenance, Inc. ("GMS") under Section 4 of the Federal Arbitration Act ("FAA"), arises out of a state-court lawsuit filed by Baize against Defendants Arch Resources, Inc. ("Arch Coal"), Mingo-Logan, LLC ("Mingo-Logan"), and Harold Napier, a Mingo-Logan employee, for injuries suffered while performing services related to his job as an underground contract mine laborer.  The following factual allegations are taken from GMS's Petition.  (ECF No. 1.)

GMS is engaged in the business of providing contract underground mining labor and supervision to owners and operators of underground mines.  (*Id.* at 2–3, ¶¶ 1, 9.)  GMS contracted with Arch Coal and Mingo-Logan to supply underground miners and supervisory employees to work at one of their mine sites located in Logan County, West Virginia, known as the Mountain Laurel Mining Complex (the "Mountain Laurel site").  (*Id.* at 3, ¶ 10.)  GMS's contract with Arch Coal and Mingo-Logan required it to indemnify, hold harmless and defend Arch Coal and Mingo-Logan for claims for bodily injury, if any, sustained by GMS employees while working at the Mountain Laurel site.  (*Id.* at 3, ¶ 11.)

At all times relevant hereto, GMS employed Baize as an underground miner at the Mountain Laurel.  (*Id.* at 3, ¶ 12.)  In consideration of his employment, Baize was required to execute an "Employer/Employee Arbitration Agreement" (the "Arbitration Agreement"), which states as follows:

> You [Baize] agree that any dispute which You [Baize] may have arising out of, in connection with, or relating to Your employment with GMS, including but not limited to any claims or disputes related to payment for services rendered or other amounts of money allegedly owed to You [Baize] by GMS or any of GMS's agents, principals, or affiliated entities; or related in any way, in whole or in part, to any term or condition of Your employment with GMS; or related in any way, in whole or in part, to any circumstance under which Your employment with GMS ceases; or regarding the validity, interpretation, construction, application, or enforcement of any of GMS's personnel policies, shall be submitted to binding arbitration before a neutral arbitrator in accordance with the rules of the American Arbitration Association, which arbitrator or panel of arbitrators, as the case may be, may grant any relief which, in the absence of the Agreement, could be granted by a court of competent jurisdiction.

(*Id.* at 3, ¶ 13; ECF No. 1-1.)

On August 19, 2020, Baize commenced an action in the Circuit Court of Logan County, West Virginia against Arch Coal, Mingo-Logan and Napier, alleging that he suffered bodily

injuries while "performing services related to his job" at the Mountain Laurel site.  (ECF No. 1 at 4, ¶ 15–16.)  GMS was not named as a defendant in that lawsuit, but has nevertheless brought the instant action seeking an order from this Court directing Baize—a signatory to the Arbitration Agreement—to proceed to arbitration of his state-court claims against Arch Coal, Mingo-Logan, and Napier—nonsignatories with respect to the Arbitration Agreement—pursuant to the terms set forth in the Arbitration Agreement.  (*Id.* at 4.)

    *B.  Procedural Background*

On June 22, 2021, Baize moved this Court to dismiss GMS's Petition pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief could be granted.  (ECF No. 7.)  Alternatively, Baize requested that this Court abstain from exercising jurisdiction over GMS's Petition pursuant to the abstention doctrine articulated in the *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 419 (1942), *Mitcheson v. Harris*, 955 F.2d 234 (4th Cir. 1992), and *Nautilus Ins. Co. v. Winchester Homes, Inc.*, 15 F.3d 371 (4th Cir. 1994) trio of cases, as well as the abstention doctrine set forth in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).  GMS timely responded on June 25, 2021, (ECF No. 10), and Baize timely replied on July 1, 2021, (ECF No. 11).  In accordance with the Memorandum Opinion and Order entered by this Court on November 10, 2021, GMS was permitted to file a surreply to Baize's Reply.  (ECF No. 30.)  GMS timely filed its Surreply to Baize's Reply on November 17, 2021.  (ECF No. 32.)

By Memorandum Opinion and Order dated February 3, 2022, this Court denied in part Baize's Motion to Dismiss, to the extent that it argued that this Court should abstain from deciding GMS's Petition.  (ECF No. 33 at 10–21.)  However, because the parties' briefing did

not adequately address the extent to which the Arbitration Agreement could be read to encompass claims made against third-party nonsignatories, this Court ordered the parties to submit additional briefing on the following issues:

1. Whether any of the theories outlined by the Fourth Circuit in *Int'l Paper*,[1] as well as any subsequent opinions from this District and the Fourth Circuit citing those theories or articulating other theories, support GMS's contention that the Arbitration Agreement between it and Baize encompasses claims made by Baize against nonsignatories; and

2. Whether other common law theories or "limited circumstances" exist—irrespective of whether they have been articulated by the Fourth Circuit or another circuit court of appeals—that support GMS's position on the arbitrability of Baize's claims against nonsignatories?

(*Id.* at 26.)  GMS and Baize timely submitted their supplemental briefing on February 18, 2022. (ECF Nos. 34, 35.)  Each party timely responded on February 28, 2022.  (ECF Nos. 38, 39.) Accordingly, Baize's Motion to Dismiss, (ECF No. 7), has been fully briefed and is now ripe for adjudication.

## II.    *LEGAL STANDARD*

A motion to dismiss for failure to state a claim upon which relief may be granted tests the legal sufficiency of a civil complaint. Fed. R. Civ. P. 12(b)(6).  A plaintiff must allege sufficient facts, which, if proven, would entitle him to relief under a cognizable legal claim.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007).  A case should be dismissed if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible

---

[1] The Court notes that GMS opted not to discuss any of the common law theories outlined in *Int'l Paper Co.*, instead arguing that "the Court's request for an analysis of [those] theories . . . inadvertently and improperly conflates [the] distinct issues" of "who must arbitrate" and "what must be arbitrated," the latter of which GMS contends is the proper issue before this Court.  (ECF No. 34 at 7.)  Moreover, in its Response to Baize's Supplemental Brief, GMS argues that "the common law theories of [*Int'l Paper Co.*] and similar authorities are inapposite" to the instant action.  (ECF No. 38 at 3–7.)

on its face." *Id.* at 570.  In applying this standard, a court must utilize a two-pronged approach.

First, it must separate the legal conclusions in the complaint from the factual allegations.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Second, assuming the truth of only the factual

allegations, the court must determine whether the plaintiff's complaint permits a reasonable

inference that "the defendant is liable for the misconduct alleged." *Id.*  Well-pleaded factual

allegations are required; labels, conclusions, and a "formulaic recitation of the elements of a

cause of action will not do." *Twombly*, 550 U.S. at 555; *see also King v. Rubenstein*, 825 F.3d

206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and

are insufficient to state a claim." (quoting *Iqbal*, 556 U.S. at 679)).  A plaintiff's "[f]actual

allegations must be enough to raise a right to relief above the speculative level," thereby

"nudg[ing] [the] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at

555, 570.

### III.    DISCUSSION

Baize has moved to dismiss GMS's Petition for two reasons.  First, Baize contends that

GMS has failed to state a claim because Baize has not brought a claim against GMS requiring

arbitration, and he did not otherwise agree to arbitrate claims against Arch Coal, Mingo-Logan,

or Napier.  (ECF No. 8 at 5–6.)  Second, Baize argues that GMS's Petition must be dismissed

because it does not have standing to sue.[2]  (*Id.* at 6–7.)  GMS, however, contends that the

language of the Arbitration Agreement "clearly embraces" Baize's state-court claims against

Arch Coal, Mingo-Logan, and Napier because they arise out of, are connected with, and relate to

---

[2] As explained in greater detail below, the Court finds that the plain language of the Arbitration Agreement unambiguously contemplates only disputes between GMS and Baize, and not disputes with third-party nonsignatories.  Therefore, the Court need not address Baize's argument that GMS lacks standing to bring the instant action.

his employment with GMS.  (ECF No. 10 at 10.)  In this respect, GMS maintains that "nothing in the [A]rbitration [A]greement limits the disputes that must be arbitrated to disputes with GMS, nor does the broad language of the [A]rbitration [A]greement exclude disputes with third parties."  (*Id.* at 11.)  GMS further contends that, even if it is unclear whether the Arbitration Agreement encompasses Baize's state-court claims against Arch Coal, Mingo-Logan, and Napier, the liberal federal policy favoring arbitration requires the Court to resolve ambiguities in the language of the Arbitration Agreement in favor of arbitration.  (*Id.* at 11.)

Section 2 of the FAA, which has been described as the "primary substantive provision of the [FAA]," *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citing *Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 581 (2008)), provides that written agreements to arbitrate controversies arising out of an existing contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  Congress passed the FAA "to reverse the longstanding judicial hostility to arbitration agreements."  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31 (1991).

Following the FAA's enactment, courts have recognized that "[t]he FAA reflects 'a liberal federal policy favoring arbitration agreements.'"  *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  Thus, although "[t]he FAA requires courts to 'enforce arbitration agreements according to their terms,'" *Lamps Plus, Inc. v. Varela*, --- U.S. ---, 139 S. Ct. 1407, 1415 (2019) (quoting *Epic Systems Corp. v. Lewis*, 584 U.S. ---, 138 S. Ct. 1612 (2018)), the Supreme Court has instructed that "ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration."  *Moses H. Cone*, 460 U.S. at 24–25; *see also Mey v. DIRECTV, LLC*, 971

6

F.3d 284, 292 (4th Cir. 2020) (quoting *Moses H. Cone*, 460 U.S. at 24–25) ("In view of the FAA's 'federal policy favoring arbitration,' however, 'as a matter of federal law any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]").

Section 4 of the FAA permits any "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. The Fourth Circuit generally requires a party seeking to compel arbitration to prove the following elements:

> (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and[,] (4) the failure, neglect or refusal of the [opposing party] to arbitrate the dispute.

*Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 84 (4th Cir. 2016) (quoting *Rota-McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690, 696 n.6 (4th Cir. 2012)).

As noted in the Court's February 3, 2022 Memorandum Opinion and Order, "the principal question before the Court is whether the terms of the Arbitration Agreement may extend to disputes between a signatory to the Arbitration Agreement—Baize—and third-party nonsignatories—Arch Coal, Mingo-Logan, and Napier." (ECF No. 33 at 24.) There are no questions concerning the formation or validity of the Arbitration Agreement between GMS and Baize. Moreover, as previously explained in this Court's February 3, 2022 Memorandum Opinion and Order, the determination of whether an arbitration agreement covers claims against third-party nonsignatories "presents no state law question of contract formation or validity," and courts must "look to the 'federal substantive law of arbitrability' to resolve this question." *Int'l*

*Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417 n.4 (4th Cir. 2000).  Accordingly, applying the federal substantive law of arbitrability, the Court proceeds to analyze whether Baize's state-court claims against Arch Coal, Mingo-Logan, and Napier are arbitrable pursuant to the Arbitration Agreement between he and GMS.

"[M]andatory arbitration is not the default form of dispute resolution but rather is permitted *only when the parties agree to it*."  *Rowland v. Sandy Morris Fin. & Est. Plan. Servs., LLC*, 993 F.3d 253, 258 (4th Cir. 2021) (emphasis added).  This is so because "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [it] has not agreed" to arbitrate.  *Int'l Paper Co.*, 206 F.3d at 416.

In the context of a third-party nonsignatory's ability to enforce, or be bound by, an arbitration agreement, this District, the Fourth Circuit, other circuit courts of appeals, and the United States Supreme Court have universally recognized that in "an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties."  *Int'l Paper Co.*, 206 F.3d at 416–17; *M.T. Bores, LLC v. Mountain Valley Pipeline, LLC*, --- F. Supp. 3d ---, 2021 WL 3286813, at *2 (S.D. W. Va. Aug. 2, 2021) (quoting *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157, 160 (4th Cir. 2004)); *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (noting that "traditional principles" of state law—such as assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel—allow a contract to be enforced by or against nonparties to the contract); *Doe v. Trump Corp.*, 6 F.4th 400, 412 (2d Cir. 2021); *AtriCure, Inc. v. Meng*, 12 F.4th 516, 524–25 (6th Cir. 2021); *Warciak v. Subway Rests., Inc.*, 880 F.3d 870, 872 (7th Cir. 2018); *Cavlovic v. J.C. Penney Corp., Inc.*, 884 F.3d 1051,

8

1057 (10th Cir. 2018); *White v. Sunoco, Inc.*, 870 F.3d 257, 264 (3d Cir. 2017); *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 9–10 (1st Cir. 2014); *Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 255 (5th Cir. 2014); *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013); *Lawson v. Life of the South Ins. Co.*, 648 F.3d 1166, 1168 (11th Cir. 2011); *Bank of America, N.A. v. UMB Fin. Servs., Inc.*, 618 F.3d 906, 912 (8th Cir. 2010).

At the outset, GMS argues that *Int'l Paper Co.*, and other authorities of the sort, are inapplicable to the instant action because those authorities address the issue of "*who must arbitrate*," which it contends is a separate and distinct issue from the issue of "*what must be arbitrated*," which it posits is the proper issue in this action.  (ECF No. 34 at 6–7.)  GMS is correct that the issue in this case is not whether Arch Coal, Mingo-Logan, and Napier, as nonsignatories to the Arbitration Agreement, may enforce the Arbitration Agreement against Baize to compel him to arbitrate his state-court claims against them.  To be sure, Arch Coal, Mingo-Logan, and Napier have not petitioned this Court, or the Circuit Court of Logan County, to compel Baize to arbitrate his claims against them.[3]

The "what must be arbitrated" GMS refers to, however, are Baize's state-court claims against third-party nonsignatories—Arch Coal, Mingo-Logan, and Napier.  In examining this question, which can be framed with greater specificity as whether the Arbitration Agreement between GMS and Baize can be properly read to encompass claims made by a signatory against third-party nonsignatories, authorities such as *Int'l Paper Co.*[4] are not necessarily dispositive, but

---

[3] Arch Coal, Mingo-Logan, and Napier have, however, concurred in GMS's Petition, (ECF No. 27), and have joined in GMS's opposition to Baize's Motion to Dismiss, (ECF No. 36).

[4] Authorities of this sort examine the extent to which third-party nonsignatories can enforce, or be bound by, arbitration agreements.  *See Int'l Paper Co.*, 206 F.3d at 416–17 (considering whether an arbitration clause can be enforced against a nonsignatory to the contract).

9

are certainly instructive.  This is so because the determination of whether the language of an arbitration agreement—which otherwise makes no reference to disputes with third-party nonsignatories—may appropriately be read to encompass disputes with third-party nonsignatories necessarily rests on whether the signatories thereto intended it to encompass such disputes.[5]  *See generally Muriithi v. Shuttle Express, Inc.*, 712 F.3d 173, 179 (4th Cir. 2013) ("The issue whether a dispute is arbitrable presents primarily a question of contract interpretation, requiring that we give effect to the parties' intentions as expressed in their agreement.").

*Int'l Paper Co.* involved a dispute between a buyer of an industrial saw and the manufacturer of the saw on the basis of a contract between the distributor of the saw and the manufacturer.  206 F.3d at 413.  After removing the buyer's action to federal court, the manufacturer moved to stay the proceedings pending arbitration on the basis of a broad arbitration clause in the distributor-manufacturer contract covering "[a]ny dispute arising out of the Contract. . . ."  *Id.* at 414.  The buyer, a nonsignatory to the distributer-manufacturer contract, argued that it was not bound by the arbitration clause and could not be forced to arbitrate its claims against the manufacturer.  *Id.* at 416.

The issue presented to the Fourth Circuit was "whether [the] arbitration clause in the distributor-manufacturer contract require[d] the buyer, a nonsignatory to the contract, to arbitrate its claims against the manufacturer."  *Id.* at 413.  Despite the broad language of the disputed arbitration clause, the Fourth Circuit looked beyond the language of the distributor-manufacturer

---

[5] The Arbitration Agreement does refer to "claims or disputes related to payment for services rendered or other amounts of money allegedly owed to [Baize] by . . . any of GMS's agents, principals, or affiliated entities[.]"  (ECF No. 1-1.)  However, it is undisputed that Arch Coal, Mingo-Logan, and Napier are not agents, principals, or affiliated entities of GMS.

contract to "[w]ell-established common law principles," including (1) incorporation by references; (2) assumption; (3) agency; (4) veil piercing/alter ego; and (5) estoppel to answer this question.  *Id.* at 416–17.  Utilizing the doctrine of estoppel,[6] the Fourth Circuit held that the buyer was estopped from refusing to arbitrate its dispute with the manufacturer because the contract containing the arbitration clause "provide[d] part of the factual foundation for every claim asserted by [the buyer] against the [manufacturer]."  *Id.* at 418.

While *Int'l Paper Co.* addresses the extent to which a nonsignatory may be compelled to arbitrate disputes pursuant to an arbitration agreement it otherwise has not agreed to—which, to be sure, presents a separate issue from the instant case—the Court finds its guidance instructive. Like the Arbitration Agreement in this case, which broadly covers "any dispute which [Baize] may have arising out of, in connection with, or relating to [his] employment with GMS," (ECF No. 1-1), the disputed arbitration clause in *Int'l Paper Co.* broadly covered "[a]ny dispute arising out of the Contract."  206 F.3d at 414.  Yet, the Fourth Circuit did not merely accept the arbitration clause's breadth—which was certainly broader than the Arbitration Agreement here— as wholly dispositive in that case, as GMS suggests that the Court do in the instant action.[7] Rather, because the distributor-manufacturer contract in that case did not otherwise expressly contemplate claims brought by third-party nonsignatories, the Fourth Circuit resorted to the "[w]ell-established common law principles" governing the extent to which nonsignatories could

---

[6] In the arbitration context, this doctrine precludes a nonsignatory "from refusing to comply with an arbitration clause 'when it receives a "direct benefit" from a contract containing an arbitration clause.'"  *Int'l Paper Co.*, 206 F.3d at 418.

[7] GMS asks the Court to find that "[t]he broad, clear language of the Arbitration Agreement contains no terms expressly carving out and excluding claims by Baize against third party nonsignatories."  (ECF No. 34 at 10.)

enforce, or be bound by, arbitration clauses to assess the extent to which the buyer could be bound by the disputed arbitration clause. *Id.* at 417.

Although this analysis did not focus on the broad language of the disputed arbitration clause, *Int'l Paper Co.*'s guidance is instructive because it illustrates the limited circumstances under which arbitration agreements may be appropriately read to encompass claims by or against third-party nonsignatories, particularly when the disputed arbitration agreement does not otherwise expressly encompass disputes with third-party nonsignatories. Of critical importance, despite the extremely broad language of the disputed arbitration clause in *Int'l Paper Co.*— which, again, covered "*[a]ny dispute arising out of the Contract*"—the Fourth Circuit still found it necessary to examine the common law principles described above to assess the extent to which the buyer, a nonsignatory, could be required to arbitrate its disputes. *Int'l Paper Co.*, 206 F.3d at 416–17. Thus, even though the buyer's claims were all factually predicated on the distributor-manufacturer contract and "arose out of that contract," the arbitration clause's broad language alone was insufficient to compel the nonsignatory buyer to arbitrate his claims.

In this case, the Arbitration Agreement does not expressly encompass disputes with third-party nonsignatories. Rather, only those disputes "arising out of, in connection with, or relating to [Baize's] employment *with GMS*" are expressly contemplated by the Arbitration Agreement. (ECF No. 1-1) (emphasis added). In light of the principles articulated with regard to the enforceability of arbitration agreements over claims by or against third-party nonsignatories, the Court must determine whether the parties intended, based on the plain language of the Arbitration Agreement, that disputes with third-party nonsignatories be subject to binding arbitration. As GMS correctly notes, should the Court find any ambiguity in the scope of the

12

Arbitration Agreement, the Court must resolve such ambiguity in favor of arbitration. Nevertheless, in this case, an examination of the plain language of the Arbitration Agreement clearly reveals that the Arbitration Agreement encompasses only disputes between Baize and GMS, and does not cover disputes with third-party nonsignatories.

As noted above, the Arbitration Agreement requires Baize to submit to binding arbitration

> any dispute which [he] may have arising out of, in connection with, or relating to [his] employment *with GMS*, including but not limited to any claims or disputes related to payment for services rendered or other amounts of money allegedly owed to [him] *by GMS* or any of GMS's agents, principals, or affiliated entities; or related in any way, in whole or in part, to any term or condition of [his] employment *with GMS*; or related in any way, in whole or in part, to any circumstance under which [his] employment *with GMS* ceases; or regarding the validity, interpretation, construction, application, or enforcement of any of *GMS's* personnel policies[.]

(ECF No. 1-1) (emphasis added).

GMS contends that the Arbitration Agreement "is not amenable to any plausible interpretation that it does *not* cover [Baize's claims]." (ECF No. 34 at 10) (emphasis in original). In this respect, GMS argues that "[w]hen the operative language defining the scope of arbitrable disputes is as broad and clear as in this Arbitration Agreement, the contention that Baize's bodily injury claims arose from, relate to and are connected with his employment by GMS is not just a plausible interpretation; it is the only plausible interpretation." (*Id.* at 9.) Such a reading of the Arbitration Agreement, however, is contrary to the Fourth Circuit's guidance in *Int'l Paper Co.* Arch Coal, Mingo-Logan, and Napier are not signatories to the Arbitration Agreement. Absent other common law theories enabling them to enforce or be bound by the Arbitration Agreement, the plain language of the Arbitration Agreement contemplates no right of enforcement by them,

nor does it expressly contemplate that their disputes with Baize, if any, be subject to mandatory arbitration.  Broad as it may be, the language of the Arbitration Agreement alone is insufficient to support a finding here that the parties intended disputes with third-party nonsignatories be subject to binding arbitration.

GMS's reading of the Arbitration Agreement also runs afoul of the language of the Arbitration Agreement itself.  The Arbitration Agreement contemplates disputes "arising out of, in connection with, or relating to [Baize's] employment *with GMS*."  (ECF No. 1-1) (emphasis added).  This phrase alone—notwithstanding the fact that Arch Coal, Mingo-Logan, and Napier are not signatories to the Arbitration Agreement, and otherwise did not participate in the formation and execution of the Arbitration Agreement—indicates the parties' intention that the scope of arbitrable disputes be limited to Baize's disputes *with GMS*.

Nevertheless, the Arbitration Agreement goes on to describe a non-exhaustive list of the types of disputes that may be subject to binding arbitration, including

> any claims or disputes related to payment for services rendered or other amounts of money allegedly owed to [him] *by GMS* or any of GMS's agents, principals, or affiliated entities; or related in any way, in whole or in part, to any term or condition of [his] employment *with GMS*; or related in any way, in whole or in part, to any circumstance under which [his] employment *with GMS* ceases; or regarding the validity, interpretation, construction, application, or enforcement of any of *GMS's* personnel policies[.]

(ECF No. 1-1) (emphasis added).  Although these types of disputes form only a non-exhaustive list of the types of disputes that are subject to the Arbitration Agreement, it is clear that the listed disputes are only disputes that Baize could possibly have with GMS.  Arch Coal, Mingo-Logan, and Napier were not responsible for paying Baize for services rendered, nor would they have owed Baize any money for services rendered.  Arch Coal, Mingo-Logan, and Napier are not

agents, principals, or affiliated entities of GMS.  Arch Coal, Mingo-Logan, and Napier did not have the authority and were not responsible for setting the terms and conditions of Baize's employment with GMS.  Baize would have no dispute with Arch Coal, Mingo-Logan, or Napier should GMS terminate his employment.  Lastly, between Baize and GMS, GMS's personnel policies are of no significance to Arch Coal, Mingo-Logan, and Napier.  Clearly, these listed disputes are of the sort that Baize could only have with GMS.  Although it is non-exhaustive, this list is indicative of the parties' intention that the Arbitration Agreement encompass only disputes between GMS and Baize, and not disputes with third-party nonsignatories.

Not only does GMS's reading contradict Fourth Circuit guidance and the plain language of the Arbitration Agreement, it also flies in the face of common sense.  Should the Court adopt GMS's reading of the Arbitration Agreement and compel Baize to arbitrate his disputes with Arch Coal, Mingo-Logan, and Napier, a vast number of disputes that would not otherwise be subject to the Arbitration Agreement could be found to be arbitrable.  For example, if Baize suffered a car accident while driving home from working at the Mountain Laurel site due to another driver's negligence, would his personal injury claim against the negligent driver be subject to mandatory arbitration pursuant to the Arbitration Agreement between he and GMS?  Or suppose GMS required Baize to relocate to another state to work at another mining complex, and Baize hired a moving company to move his personal belongings.  If the moving company destroyed all of Baize's personal belongings due to their own negligence, and Baize brought a claim against them, would that claim be subject to mandatory arbitration pursuant to the Arbitration Agreement?

Common sense would dictate no, these claims would not be subject to mandatory arbitration under the Arbitration Agreement.  However, under GMS's reading of the Arbitration Agreement,[8] but for Baize's employment with GMS he would not have been driving home from working at the Mountain Laurel site, nor would he have hired a moving company to relocate his personal belongings.  But because those claims "arose from" and were "related to" his employment with GMS, GMS's reading of the Arbitration Agreement would subject them to mandatory arbitration.  Such a result, though, is nonsensical.  Obviously Baize did not agree to arbitrate claims arising from a third-party nonsignatory driver's negligence, nor did he agree to arbitrate claims arising from a third-party nonsignatory moving company's destruction of his personal belongings.  The result is no different if, as was the case here, Baize's dispute arises from workplace injuries allegedly suffered due to the failure of third-party nonsignatories to maintain a safe workplace.

Examining the plain, unambiguous language of the Arbitration Agreement, while maintaining cognizance of the Fourth Circuit's guidance with regard to the extent to which an arbitration agreement may appropriately be read to encompass claims by or against third-party nonsignatories, it is clear that the Arbitration Agreement does not cover Baize's state-court claims against Arch Coal, Mingo-Logan, and Napier.  The Arbitration Agreement is clear in that it only encompasses "dispute[s] . . . arising out of, in connection with, or relating to [his] employment *with GMS*."  (ECF No. 1-1) (emphasis added).  Because Baize's underlying state-court claims are not made against GMS, they are not arbitrable pursuant to the Arbitration

---

[8] GMS interprets the Arbitration Agreement to cover Baize's state-court claims because the Arbitration Agreement covers "dispute[s] . . . arising out of, in connection with, or relating to [Baize's] employment with GMS," and "[b]ut for his employment, Baize would [not] have been at the mine site exposed to injury."  (ECF No. 10 at 9.)

Agreement.  Accordingly, GMS has failed to state a claim upon which relief could be granted and its Petition is **DISMISSED WITH PREJUDICE**.

<em>IV.    CONCLUSION</em>

For the foregoing reasons, the Court **GRANTS** Defendant Bradley Baize's Motion to Dismiss, (ECF No. 7), and **DISMISSES WITH PREJUDICE** Petitioner GMS Mine Repair & Maintenance, Inc.'s Complaint/Petition, (ECF No. 1).  The Court **DIRECTS** the Clerk to remove this action from the Court's docket.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        March 22, 2022

THOMAS E. JOHNSTON, CHIEF JUDGE